1        SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                    CRIMINAL DIVISION

3    - - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA       :

5              vs.                  :   No. M4828-04

6    MICHAEL MOMENT,                :

7              Defendant.    :

8    - - - - - - - - - - - - - - x

9                              Washington, D.C.
                              Wednesday, August 11, 2004
10

11        The above-entitled matter came on for trial
    before the HONORABLE CRAIG ISCOE, Associate Judge,
    in Courtroom No. 212, commencing at approximately
12   12:48 p.m.

13              THIS TRANSCRIPT REPRESENTS THE
             PRODUCT OF AN OFFICIAL REPORTER,
14           ENGAGED BY THE COURT, WHO HAS
             PERSONALLY CERTIFIED THAT IT
15           REPRESENTS THE TESTIMONY AND
             PROCEEDINGS OF THE CASE AS
16           RECORDED.

17           APPEARANCES:

18           On behalf of the Government:

19           MICHAEL BAKER, ESQ.
             EDWARD S. KEEFE, ESQ.
20           Assistant United States Attorney
             Washington,  D. C.
21
             On behalf of the Defendant:
22
             RUSSELL HAIRSTON, ESQ.
23           Attorney at Law
             Washington, D.C.
24

25   MARIA M. ALLISON, RPR
     Official Court Reporter    Telephone (202) 879-1050

**EXHIBIT #  2**

<u>TABLE OF CONTENTS</u>

<u>WITNESSES</u>

<u>Direct</u> <u>Cross</u> <u>Redirect</u> <u>Recross</u>

<u>For the Government:</u>

PEARL REARDON

(By Mr. Baker) .............. 9

(By Mr. Hairston) .................. 25

DONNA WILSON

(By Mr. Baker) ............. 51

(By Mr. Hairston) .................. 60

(By Mr. Baker) .............................. 67


<u>For the Defendant:</u>

NETTIE MOMENT

(By Mr. Hairston) .......... 72

FELITA PHILLIPS

(By Mr. Hairston) .......... 81



<u>EXHIBITS</u>

<u>Marked</u>        <u>Received</u>

<u>For the  Defendant</u>:

No.  1   Part of PD252 .............. 61

<u>MISCELLANY</u>

Opening Statement on behalf of the Government....... 5
Motion for Judgment of Acquittal.................... 68
Court's Ruling on the Motion........................ 70
Certificate of Court Reporter.......................89

# P R O C E E D I N G S

THE DEPUTY CLERK:  Recalling United States v.
Michael Moment, M4828-04.

MR. HAIRSTON:  Good afternoon, Your Honor.
Russell Hairston for Michael Moment, who is present.

THE COURT:  Good afternoon.  We're waiting for
Government counsel to come in.

(Pause.)

Okay.  Counsel, it is now 12 minutes to 1:00.
We called the case a moment ago.  We could begin and
spend about ten minutes on this case or just resume at
2:05.  I've got a couple of other matters to  -- Excuse
me just a moment.  (Pause.)  I've got a couple of other
matters that may come up.  I've also got a meeting with
other judges I'm supposed to attend.  What's your
preference, counsel?  To do openings now and begin trial
after lunch?

MR. HAIRSTON:  Can we just go after lunch,
Your Honor.

THE COURT:  Why don't we just do that?  I
called this matter because everybody has been waiting.
I keep hoping, but people keep walking in, other counsel
who I have to get to, so we won't interrupt our trial
time.  We'll continue this matter at 2:05.

1          MR. HAIRSTON:  Your Honor, may I ask for 2:15?

2     I have a bench warrant return in front of Judge

3     Mitchell-Rankin.

4          THE COURT:  If you'd be back at 2:15.  Tell

5     Judge Mitchell-Rankin that we are in trial; I do expect

6     you at 2:15.

7          MR. HAIRSTON:  Thank you, Your Honor.

8          THE COURT:  I'll give you till 215.

9          MR. BAKER:  2:15, Your Honor.  Thank you.

10          THE COURT:  Thank you.  And the reporter too,

11     thank you.

12          (Proceedings recessed.  12:50 p.m.)

13          (Proceedings resumed.  2:30 p.m.)

14

15                    **AFTERNOON SESSION**

16          THE DEPUTY CLERK:  Recalling United States v.

17     Michael Moment, M4828-04.

18          MR. HAIRSTON:  Good afternoon, Your Honor.

19     Russell Hairston for Michael Moment, who is coming

20     forward.

21          MR. BAKER:  Michael Baker for the Government,

22     Your Honor.

23          THE COURT:  Okay, the matter is here for

24     trial.  Are we ready to proceed?

25          MR. HAIRSTON:  Yes, Your Honor.

4

1       MR. BAKER:  Yes, Your Honor.

2       THE COURT:  Okay.  I'll invoke the rule

3   against witnesses at this time, ask for both parties to

4   make certain that their witnesses are out of the

5   courtroom.  Any witness who will testify for either side

6   should go to a witness room.

7       Okay.  Who will be trying this case for the

8   Government?

9       MR. BAKER:  Michael Baker, Your Honor.

10      THE COURT:  Mr. Keefe, will you be playing any

11  role?

12      MR. KEEFE:  No, Your Honor.

13      THE COURT:  No speaking role?

14      MR. KEEFE:  That's right.

15      THE COURT:  Are all witnesses for either side

16  out of the courtroom?  Mr. Baker, for your side?

17      MR. BAKER:  Yes, Your Honor.

18      THE COURT:  Mr. Hairston, for the defense?

19      MR. HAIRSTON:  Yes, Your Honor.

20      THE COURT:  Very well.  Let's proceed to

21  opening statement.  Mr. Baker.

22      MR. BAKER:  Thank you, Your Honor.

23

24  **OPENING STATEMENT ON BEHALF OF THE GOVERNMENT:**

25      MR. BAKER:  Your Honor, this is a case that

1    occurred on January 27th, 2004.  You will hear testimony

2    from Ms. Reardon that on that date, while she was in her

3    home with her daughter and her granddaughter, the

4    defendant, Mr. Moment, called her.  They had a

5    discussion.  He told her at that time that -- words to

6    this effect; that he was going to meet her some night

7    and beat the shit out of her, causing Ms. Reardon to be

8    frightened.  Ms. Reardon then contacted the Police

9    Department via 911.

10           You will also hear from Officer Wilson  --

11    excuse me  -- Detective Wilson from the Metropolitan

12    Police Department, who will testify that she was called

13    to investigate this compliant; that she spoke with

14    Ms. Reardon and confirmed what was in the complaint with

15    Ms. Reardon; that she also spoke with the defendant;

16    that the defendant agreed to come down to the station

17    and did come down to the station; that Officer Wilson

18    had a discussion with him, as she will testify to; that

19    she Mirandized the defendant and then proceeded to

20    interrogate the defendant, who admitted that, yes, on

21    that day in question, January 27th, he did call

22    Ms. Reardon; that he was upset; and that he did tell

23    Ms. Reardon that he wanted to meet her some dark night.

24    He denied that he threatened Ms. Reardon.

25           Your Honor, at the conclusion of the evidence,

1   the Government will ask that you find the defendant

2   guilty of the crime of attempted threats to do bodily

3   harm.

4           THE COURT:  Thank you.  Mr. Hairston, do you

5   wish to open at this time?

6           MR. HAIRSTON:  No, Your Honor, we are going to

7   reserve our opening statement.  However, I know Your

8   Honor said if there was an issue regarding my client's

9   statements to the police, that that issue should be

10  raised.  I do have discovery.  However, I don't have

11  anything to that effect of what the prosecutor just

12  said.

13          THE COURT:  Mr. Baker.

14          MR. BAKER:  Your Honor, I have the package

15  that was sent to defendant's counsel.  It was sent on

16  May 12th.  It contains all the police forms  -- I have a

17  copy of it  -- with the statement.

18          THE COURT:  Back in your court, Mr. Hairston.

19  Did you receive that?

20          MR. HAIRSTON:  I did receive the packet.

21          THE COURT:  But it doesn't have that?

22          MR. HAIRSTON:  It does not have anything along

23  the lines of the officer.  Only thing I have is the

24  detective's note saying that at no time did I threaten

25  anyone at any time.  That's the only statement that I

1    have that was made by my client.

2             THE COURT:  Government, this is exactly why I

3    had asked about what statements you had.  What are you

4    referring to?  When you refer to documents you have

5    provided to the defense, is there a document other than

6    the one that Mr. Hairston has just looked at?

7             MR. BAKER:  Well, yes, Your Honor, and in the

8    package we note the PD numbers.  The document that I'm

9    referring to is the Affidavit in Support of the Arrest

10    Warrant.

11             THE COURT:  Do you have that, Mr. Hairston?

12             MR. HAIRSTON:  Yes.

13             THE COURT:  Are there any statements that are

14    not in that affidavit or in another document that you

15    have provided?

16             MR. BAKER:  No, Your Honor.

17             THE COURT:  I will give Mr. Hairston a moment

18    to look at that affidavit.

19             MR. HAIRSTON:  Very well.

20                 (Pause)

21             MR. HAIRSTON:  Okay, Your Honor.  Yes, I do

22    have the affidavit, and I see where  -- That's fine.  I

23    do see it.  It conflicts with other documents that were

24    submitted in the discovery, but I guess that's something

25    we will have to address at trial.

1         THE COURT:  But are you satisfied now that you

2    have received those statements?

3         MR. HAIRSTON:  Yes, Your Honor.

4         THE COURT:  Very well.  Okay.  Government?

5    Mr. Hairston, are you ready to proceed?  Mr. Hairston.

6         MR. HAIRSTON:  One brief moment, Your Honor.

7    Yes, Your Honor, we are ready to proceed.

8         THE COURT:  Okay.  Government, --

9         MR. BAKER:  Yes, Your Honor.

10        THE COURT:  -- you may call your first

11    witness.

12        MR. BAKER:  Thank you.  The Government calls

13    Ms. Pearl Reardon.

14        THE DEPUTY CLERK:  Ma'am, you can take the

15    stand and raise your right hand.

16        THE WITNESS:  Here?

17        THE DEPUTY CLERK:  Yes.  Please raise your

18    right hand to be sworn.

19        Thereupon,

20                    **PEARL REARDON,**

21    having been called as a witness on behalf of the

22    Government and having been first duly sworn by the

23    Deputy Clerk, was examined and testified, as follows:

24

25                   **DIRECT EXAMINATION**

1        **BY MR. BAKER:**

2        Q.    Ms. Reardon, would you state your name for the

3    record and spell it, please?

4        A.    My name is Pearl R. Reardon.   P-E-A-R-L   R.

5    R-E-A-R-D-O-N.

6        Q.    And, Ms. Reardon, where do you live?

7        A.    I live at 4339 Harrison Street, Northwest,

8    Washington, D. C. 20015.

9        Q.    Are you employed?

10        A.    Self-employed.

11        Q.    What's the name of your company?

12        A.    We do rental management.

13        Q.    And how long have you been in that business?

14        A.    Since 1982.

15        Q.    Ms. Reardon, do you have any children?

16        A.    Two.

17        Q.    Could you tell the Court the names of your

18    children?

19        A.    My first son's name is Kareem I. Phillips, and

20    my daughter's name is Felita A. Phillips.

21        Q.    And drawing your attention to your daughter.

22    Do you recall, taking you back to November of 2003, a

23    discussion that you had with your daughter concerning

24    her boyfriend?

25        A.    Yes.

1      Q.    Now, as a result of that discussion that you

2   had with your daughter, did you do something?

3      A.    I went to the computer and looked up the name

4   because I thought it wasn't real.  So, I went and looked

5   it up.

6      Q.    You went and looked up the name.  The name of

7   whom?

8      A.    Moment.

9      Q.    And how did you get that name?

10     A.    Michael Moment?

11     Q.    Yes.

12     A.    How did I get it?

13     Q.    Yes.

14     A.    From people data and from the Internet.

15     Q.    Now, moving forward to January of  -- January

16  24, 25th, that period of time, 2004, was there some

17  concern on your part about your daughter at that time?

18     A.    Yes.

19     Q.    Tell the Court what your concern was.

20     A.    She was missing with my granddaughter from the

21  Friday, Saturday, Sunday and Monday, and since I didn't

22  -- I had never met the person she said she had some

23  concerns about, I was worried.

24            MR. HAIRSTON:  Objection, Your Honor.

25            THE COURT:  Basis?

1          MR. HAIRSTON:  Hearsay.

2          THE COURT:  I'll accept it not for the truth

3     of the fact asserted but why she took particular

4     actions.  Overruled.

5          MR. HAIRSTON:  But, Your Honor, there was no

6     -- and foundation as well.  There was no testimony

7     regarding that.  Can we approach outside of the witness?

8          THE COURT:  You may because I'm missing

9     something.  If you could just take a seat, ma'am?  Step

10    down and take a seat in the jury box.

11          (Thereupon, the witness withdrew from the

12    witness stand, counsel for the parties approached the

13    bench and conferred with the Court, in low tones of

14    voice, as follows:)

15          MR. HAIRSTON:  Your Honor, we object and also

16    on the foundation.  She said that -- There has been no

17    testimony or nothing to suggest that her daughter had

18    concerns about the individual.  She just said that her

19    daughter was dating a person.  Now she is testifying

20    that her daughter had some concerns about somebody.

21    There is no foundation for that, and it's inflammatory

22    and it's prejudicial.

23          THE COURT:  I don't know who that person is at

24    this point, but even if it's your client, I'm not going

25    to say that her -- I'm not going to take her testimony

1    to establish that her daughter had any concerns but

2    merely why she took particular actions.

3              MR. HAIRSTON:  Very well.

4              THE COURT:  Thank you.

5              MR. BAKER:  And that's the purpose for the

6    introduction of this testimony.

7              THE COURT:  Very well.  You may come back.

8              (Thereupon, the proceedings at the bench were

9    concluded, counsel for the parties returned to their

10   respective places at counsel table, the witness resumed

11   the witness stand and testified further, as follows:)

12             BY MR. BAKER:

13   Q.    Ms. Reardon, in late January of 2004, you had

14   some concerns about your daughter.  What did you do as a

15   result of those concerns?

16   A.    First, we went to her place, her house, and we

17   looked, and his things seemed disheveled, so we didn't

18   figure she had been packed to go anywhere.  And we

19   called the police and asked, but she is an adult, so

20   the concern was the child.  And they say where a child

21   is involved, I should have reported it, but what I did

22   instead, I went back to the file after I had researched,

23   and there was one person in there that came up named

24   Nettie Moment, and I thought before I call the police, I

25   will see whether or not -- because she said the man's

1    name was Michael Moment.  So, I would see whether or not

2    these people are related before I call the police.

3         Q.    Let me stop you for a moment, if I may.  Your

4    daughter had told you that the person that she was

5    seeing --

6         A.    Yes.

7         Q.    -- was Mr. Michael Moment?

8         A.    Yes.

9         Q.    And you found this name "Nettie Moment"?

10        A.    Yes.

11        Q.    What did you do next?

12        A.    I called.  She works for a  -- There was a big

13   article.  She works for a contractor in  -- that works

14   with the Coast Guard, and I called the Coast Guard.

15        Q.    Did you at some point call Nettie?

16        A.    No.  I actually asked them to give me her

17   number, and they said they couldn't because she wasn't

18   at work, but they would call her and have her call me.

19        Q.    And at some point in time, did you speak with

20   Nettie Moment?

21        A.    Yes.  She called me.

22        Q.    And what did you learn as a result of that

23   conversation with Nettie?

24        A.    That my granddaughter had slept at her house

25   and that my daughter and her boyfriend had gone home.

1    And she said I could call her any time.

2              MR. HAIRSTON:  Objection, Your Honor.

3              THE COURT:  Hearsay?

4              MR. HAIRSTON:  Yes.

5              THE COURT:  I'm going to permit the testimony

6    only as necessary to explain any other related

7    statements by this witness.  I will not consider the

8    truth of the facts they assert.

9              MR. HAIRSTON:  Very well, Your Honor.

10             BY MR. BAKER:

11        Q.    Now, did you have any contact with Mr. Moment

12   after that call with the two  -- when you spoke with

13   Nettie?

14        A.    Yes, I did.

15        Q.    Tell us about that contact with Mr. Moment.

16        A.    He called my home.

17             MR. HAIRSTON:  Objection, Your Honor.

18             THE COURT:  Basis?

19             MR. HAIRSTON:  Foundation, and hearsay again.

20             THE COURT:  It's a statement of party

21   opponent.  I'm going to permit it to come in.

22             MR. HAIRSTON:  Your Honor, may we approach

23   again?

24             THE COURT:  You may.  Ma'am, if you could step

25   over to the jury box?

1    (Thereupon, the witness withdrew from the

2    witness stand, counsel for the parties approached the

3    bench and conferred with the Court, in low tones of

4    voice, as follows:)

5    MR. HAIRSTON:  Your Honor, this witness has

6    already testified that she didn't know my client nor had

7    she ever met him or spoken with him.  Now she's getting

8    ready to testify that she spoke with an individual over

9    the phone, not knowing for a fact or for certain that

10   that was my client.

11   THE COURT:  I think Mr. Baker attempted to lay

12   a foundation, --

13   MR. BAKER:  I will.

14   THE COURT:  -- and then you are free to argue

15   that this is not the statement.

16   MR. HAIRSTON:  Very well.

17   THE COURT:  Or a question regarding that.  Are

18   there any other issues you think are going to be coming

19   up regarding the --

20   MR. HAIRSTON:  Outside of the statement that

21   he made or allegedly made to the officer, there will be

22   an oral motion for suppression because it wasn't one

23   filed based on the --

24   THE COURT:  The trial has begun.

25   MR. HAIRSTON:  Right.  I understand.

1    THE COURT: Can't make a motion to suppress
2  now. Has to be done in pretrial --
3    MR. HAIRSTON: Well, --
4    THE COURT: -- motions, and you said no.
5    MR. HAIRSTON: But that was -- Well, it will
6  be, well, an oral motion in limine to preclude that
7  statement then, Your Honor.
8    THE COURT: The statement about to come out?
9  Have you revealed the contents of this statement to --
10    MR. BAKER: Yes, Your Honor.
11    MR. HAIRSTON: Very well.
12    THE COURT: This is not a statement that's
13  arguably a product of the interrogation, in any case?
14    MR. HAIRSTON: I'm sorry.
15    THE COURT: It's not a statement that is
16  arguably the product of investigatory interrogation?
17    MR. HAIRSTON: A statement that he made to the
18  detectives?
19    THE COURT: Statement that was made to her.
20    MR. HAIRSTON: Oh, okay, no, not to her. What
21  I'm saying -- you said were there any other issues to
22  come out, and I was saying the one with the -- when the
23  officer takes the stand, that will --
24    THE COURT: Very well. Okay.
25    Ma'am, you may resume your seat on the witness

1  stand.  Thank you.

2          (Thereupon, the proceedings at the bench were

3  concluded, counsel for the parties returned to their

4  respective places at counsel table, the witness resumed

5  the witness stand and testified further, as follows:)

6          BY MR. BAKER:

7      Q.    Ms. Reardon, before we get into that contact.

8      A.    Yes.

9      Q.    On January 27th at  -- in the afternoon, where

10 were you?

11     A.    I was at home.

12     Q.    And was there anyone else with you at that

13 time?

14     A.    My daughter, Felita, and my granddaughter,

15 Alexandria.

16     Q.    And your granddaughter is the little girl that

17 you were referring to earlier?

18     A.    Yes.

19     Q.    Where were you sitting?

20     A.    We were sitting at the dining table.

21     Q.    Had any phone calls been made --

22     A.    No.

23     Q.    -- prior to the contact with Mr. Moment?

24     A.    No.

25     Q.    Tell us about the contact.  What happened?

1    A.    We were sitting at the dining table.  I have a
2   remote phone, so the phone was there with us, and a call
3   came in, and I heard a crude voice saying, ("Felita
4   there?"  So, I said no.  Then the person began to yell
5   saying, "Woman, woman, if you ever call any family of
6   mine, I am going to meet you in a bar, and I'm going to
7   beat the shit out of you."  I said, "I don't go to bars,
8   whoever you are."  He said, "Well, I'm going to meet you
9   in an alley on a dark night, and I'm going to beat the
10  shit out of you." ) My daughter raised her brows, and she
11  told me that he had called on her cell phone, and she
12  hung up on him.
13            MR. HAIRSTON:  Objection, Your Honor.
14            THE COURT:  Sustained.
15            BY MR. BAKER:
16       Q.    Ms. Reardon, --
17       A.    Yes, sir.
18            THE COURT:  Ma'am, you can't talk about
19  certain statements made by other people.
20            THE WITNESS:  Okay.
21            THE COURT:  Just really --  You've done
22  nothing wrong.
23            THE WITNESS:  Okay.
24            BY MR. BAKER:
25       Q.    Who did you believe was on the other end of

1    that phone?

2        A.    Michael Moment.

3        Q.    Did that fact -- Was that fact confirmed to

4    you in any way?

5            MR. HAIRSTON:  Your Honor, I'm sorry.  I

6    object to that.

7        A.    Yes, sir.

8            MR. HAIRSTON:  Calls for speculation.  Move to

9    strike.

10           THE COURT:  As to whom she believes, I will

11   sustain.

12           MR. HAIRSTON:  Move to strike, Your Honor.

13           THE COURT:  Mr. Baker, any opposition to

14   striking?  Let me hear from you.

15           MR. BAKER:  I'm sorry.  What was the --

16           THE COURT:  You had asked who did she believe

17   was on the phone, and I had sustained that.  Without

18   more, I sustained that objection.  I will grant the

19   motion to strike.  You may rephrase, if you wish.

20           BY MR. BAKER:

21       Q.    Ms. Reardon, --

22       A.    Yes.

23       Q.    -- did you learn anything subsequently to that

24   call?

25       A.    Yes.

1     Q.    What did you learn?

2     A.    My daughter was surprised, and she said she

3    went --

4          MR. HAIRSTON:  Objection, Your Honor.

5          THE COURT:  Sustained.

6          BY MR. BAKER:

7     Q.    Without telling us the conversation --

8     A.    Okay.

9     Q.    -- what did you learn?

10    A.    I learned that it was he who had made the

11   call.

12    Q.    How did you learn that?

13    A.    My daughter said she went --

14         MR. HAIRSTON:  Objection, Your Honor.

15         THE COURT:  Sustained.

16         THE WITNESS:  I don't know how to --

17         BY MR. BAKER:

18    Q.    Ms. Reardon, after this  -- what was your

19   reaction to the phone call?

20    A.    I was terribly frightened, terribly

21   frightened.

22    Q.    Did you say anything to your daughter?

23    A.    She heard me.  I repeated everything he said

24   to her, except the part that said "beat the shit"

25   because my granddaughter was sitting at the table.

1    Q.    What did you repeat --

2    A.    I said, "Hell."  I used the would word "hell."

3    Q.    Excuse me.  What did you repeat in the

4    presence of your daughter?

5    A.    I said something about he's going to beat the

6    hell out.  Hell.  I didn't use shit.

7         MR. HAIRSTON:  Objection, Your Honor.

8    A.    I said "hell" because my granddaughter was

9    sitting --

10        THE COURT:  Just a second.  There is an

11   objection.  I have to rule.  Basis?

12        MR. HAIRSTON:  She is speculating as to what

13   she said.  She said something about.

14        THE COURT:  I will accept with that

15   qualification.  Overruled.

16        MR. HAIRSTON:  Thank you.

17        BY MR. BAKER:

18   Q.    What did you do next?

19   A.    I went down to my studio, where I would not be

20   in the range of my granddaughter, and I called the

21   police.

22   Q.    And what did you tell the police?

23   A.    I told the police that this man has called my

24   home and threatened me.  I think I told them he

25   threatened to beat the hell out of me or -- I was just

1    totally shook up, was totally --

2        Q.    Do you recall what you told the police at that

3    time?

4        A.    I told the police that a man, Michael Moment,

5    had called my home and threatened to beat the hell out

6    of me.  That's what I said.

7        Q.    All right.

8        A.    I might have said -- I don't know.  I was

9    very frightened at that point.

10        Q.    Ms. Reardon, --

11        A.    Yes.

12        Q.    -- the person that spoke to you on the

13    phone --

14        A.    Yes.

15        Q.    -- did you -- I believe you said that there

16    was some mention of a family member?

17              MR. HAIRSTON:  Objection, Your Honor.

18              THE WITNESS:  My daughter --

19              MR. HAIRSTON:  Leading.

20              THE COURT:  Basis?

21              MR. HAIRSTON:  Leading.

22              THE COURT:  Sustained.  Rephrase.

23              BY MR. BAKER:

24        Q.    Other than the threatening language that was

25    made --

1        A.    Yes.

2        Q.    -- what else was said by that person on the

3    phone?

4        A.    After he screamed, "Woman, woman, woman" and

5    then he said that he would meet me in a bar and beat the

6    shit out of me, and I said I don't go to bars, then he

7    said, "Well, I'll meet you in an alley on a dark night,

8    and I'm going to beat the shit out of you."

9        Q.    When did you call the defendant's sister?

10       A.    I called the defendant's sister on the 26th,

11   when my daughter was missing.

12       Q.    And how many days before that  -- how many

13   days before the threatening call did you call the

14   defendant's sister?

15       A.    A day.

16       Q.    Would you tell the Court whether or not there

17   was any mention of a call to a family member?

18       A.    Yes.  Yes.  Yes.  He said that if I ever

19   called any family member of his.  That was what he said

20   before he told me what he would do to me.

21       Q.    How many minutes went by before you called

22   911?

23             THE COURT:  Minutes between what and what?

24             MR. BAKER:  Between the phone call and your

25   call to 911.

1        A.    I would say not more than five minutes because

2    I went downstairs out of the hearing of my granddaughter

3    when I called.

4              MR. BAKER:  Thank you.  No further questions.

5              THE COURT:  You may cross-examine.

6

7                        CROSS-EXAMINATION

8              BY MR. HAIRSTON:

9        Q.    Ms. Reardon, you initially called the police

10   in Montgomery County and told them that Mr. Moment had

11   kidnapped your daughter; correct?

12       A.    No.

13       Q.    You never pressed kidnapping charges against

14   Mr. Moment?

15       A.    No, sir.

16       Q.    You never told the Metropolitan Police

17   Department that he had kidnapped --

18       A.    No, sir.

19       Q.    And you stated that you had some concerns

20   about your daughter missing that Friday, Saturday,

21   Sunday and Monday?

22       A.    Yes.

23       Q.    You don't like Mr. Moment, do you?

24       A.    I don't know him.

25       Q.    Had you ever spoken to him before that phone

1    call?

2        A.    That's the first time.

3        Q.    So you don't know who called you that day?

4        A.    I do: My daughter was there, and she

5    confirmed it.

6        Q.    Did your daughter speak to the individual on

7    the phone?

8        A.    She went and called the --

9        Q.    Ma'am, answer the question, please.  Did your

10   daughter speak to the individual on the phone?

11       A.    No, but I had an open phone, and she could

12   hear everything that was going on.  And I repeated,

13   except the part that was  -- I thought was not good

14   language for my granddaughter to hear.

15       Q.    You said that your initial concerns were for

16   your grandchild and not your daughter?

17       A.    Yes.  For both, but mostly for the child.

18             MR. HAIRSTON:  Court's indulgence.

19                         (Pause.)

20             And you said that you don't know Mr. Moment,

21   but you don't have any reason to dislike him; correct?

22       A.    Well, I didn't like the fact that he called me

23   to threaten me, and I don't know him.

24       Q.    And you've never said that you don't like

25   Mr. Moment?

1    A.    No.  I didn't  -- I don't know the man.

2    Q.    Okay.  So you never --

3    A.    First time I'm seeing him is right there.

4    Q.    Okay.  So you never told anybody that you

5    don't like Mr. Moment?

6    A.    No.

7    Q.    Do you know where Mr. Moment lives, ma'am?

8    A.    No, sir.

9    Q.    Do you know if he lives in D.C.?

10   A.    I have no idea, sir.

11         MR. HAIRSTON:  Court's indulgence.

12                    (Pause)

13   Q.    Ms. Reardon, you said that you didn't press

14   charges against Mr. Moment, as far as kidnapping your

15   daughter?

16   A.    Absolutely not.

17   Q.    And you have never said to anybody that

18   Mr. Reardon kidnapped your daughter?

19   A.    No.  Absolutely not.

20   Q.    Do you remember a time when Mr. Moment came by

21   your house, and you slammed the door on his leg?

22   A.    Did he come by?  I hope not.  I hope he didn't

23   come to my house.

24   Q.    Was there a time when Mr. Moment went to a

25   ballet recital or a ballet function for your

1    granddaughter, and you slammed the door on his leg?

2        A.    Slammed which door, sir?  No.  Absolutely not.

3        Q.    Now, you said you called the Nettie Moment

4    employment?

5        A.    Yes.

6        Q.    And how did you get that number, ma'am?

7        A.    There was an article in the paper about  -- in

8    the Internet about her, and I didn't know whether they

9    were related or not, but since my daughter was missing

10   and my daughter told me she had concerns about this guy

11   she met, I said --

12       Q.    Ma'am, I just asked how did you get the

13   number.  That's all.

14       A.    I went to the computer, and I ran "Moment,"

15   and her name came up as working for a contractor for the

16   Coast Guard.

17       Q.    Okay.  Thank you very much, ma'am.  So you

18   called the Coast Guard to get her phone number?

19       A.    Yes.

20       Q.    And you left a message for her?

21       A.    To call me.

22       Q.    Okay.

23       A.    Yes.

24       Q.    And you stated that Nettie Moment told you

25   that your granddaughter spent the night with her?

1    A.    Yes.

2    Q.    And that your daughter and Mr. Moment had gone

3    home?

4    A.    Right.  So at least I knew they were safe

5    then.

6    Q.    You said missing.  You thought your daughter

7    and granddaughter were missing?

8    A.    Yes.

9    Q.    But you didn't call the police?

10   A.    I called the police, and I told them the child

11   was with her mother, and I said I wanted to wait to

12   explore, and that's when I looked  -- I found Ms. Nettie

13   Moment's number, and I said let me just check and see if

14   this lady is related to this man because since my

15   daughter had concerns about him and asked me to check on

16   him for her, --

17          MR. HAIRSTON:  Move to strike, Your Honor.

18   Nonresponsive.

19          THE COURT:  Overruled, but you may ask your

20   next question.

21          BY MR. HAIRSTON:

22   Q.    Now, you said that the individual that you

23   spoke with on the phone said that if you called his

24   family again, that he's going to meet you at a bar.

25   Correct?

1      A.    Yes.

2      Q.    And you said you don't go to bars?

3      A.    Right.

4      Q.    Then he stated he would meet you in an alley?

5      A.    Right.

6      Q.    And you stated you don't go to alleys either;

7 correct?

8      A.    I didn't say that, no.

9      Q.    But you don't go to alleys; correct?

10      A.    I live off an alley, and my car is -- I have

11 to drive through an alley to get into my car pad.  I

12 live in D.C.

13      Q.    But you said to him, "Whoever you are, please

14 stop calling;" correct?

15      A.    I don't recall saying that.

16      Q.    Okay.  But you just said you didn't go to a

17 bar?

18      A.    I said I don't go to a bar.  Then he said he

19 would meet me in the alley on a dark night and beat the

20 shit out of me.

21      Q.    If you continue to call his family?

22      A.    No, he didn't say that.  So then he said --

23      Q.    Ma'am, you just testified that he said, before

24 he threatened you, --

25      A.    Yes, he did.

1       Q.    -- that if you ever called any of his family

2   members?

3       A.    Right.

4       Q.    Okay.  So, --

5       A.    He didn't say it at the end.

6       Q.    Oh, okay.

7       A.    He said it in the beginning.

8       Q.    Okay.  The individual that called initially

9   asked to speak to -- I believe your daughter's name is

10  Felita?

11       A.    Yes.

12       Q.    And you said Felita wasn't there?

13       A.    Yes, I did.

14       Q.    Was Felita there?

15       A.    She was.

16       Q.    So you didn't tell the truth to the individual

17  on the phone; correct?

18       A.    No, because Felita said she hung the phone up

19  on him; he called and was harassing her, --

20       Q.    Ma'am, I just --

21       A.    -- and she hung up the phone on him.

22       Q.    -- asked you a question as to whether or not

23  you told the truth at that time.  If you could just

24  limit your answers?  I'm asking simple yes-or-no

25  questions.  If you could just limit your answers to --

1    A.    Would you ask that question again?

2    Q.    You did not tell the truth to the individual

3  that asked to speak to Felita at the time; correct?

4    A.    I felt that this is my home, and somebody like

5  that should not be calling.  He was so rough on the

6  phone, I thought this is not the type of people I deal

7  with and they should not be calling my home.  If he

8  wants to call Felita, he could call her on her cell

9  phone, which Felita said he called her and she hung up

10  on him.

11    Q.    Ma'am, you did not know who called at the

12  time; correct?

13    A.    Felita knew.

14    Q.    Ma'am, you cannot tell me what Felita said or

15  knew.  You cannot get into her head.  Did you know who

16  was calling at the time?

17    A.    Yes.

18    Q.    Do you have personal knowledge as to who was

19  calling at that time?

20    A.    The rough way and the way in which this man

21  talked, I believed that was -- that's what I've heard of

22  him.  I believed that was him, and Felita confirmed that

23  it was him.

24    Q.    But you don't have personal knowledge?

25    A.    He was talking loudly.

1      Q.    Had you ever spoken with Mr. Moment before

2   that day, ma'am?

3      A.    No.

4      Q.    So you don't know for sure that you were

5   speaking with Michael Moment at that time; isn't that

6   correct, ma'am?

7      A.    I can't answer correct to that.  I will say

8   this, that this man who called me was so disrespectful

9   and so violent on the telephone, I'm not used to that.

10  And so from what I've heard, and Felita said it was him,

11  my daughter said it was him because she could hear.

12            MR. HAIRSTON:  Objection, Your Honor.

13     A.    She could hear.

14            MR. HAIRSTON:  Move to strike.

15            THE COURT:  I'll sustain the objection and

16  strike as to what Felita said.

17            MR. HAIRSTON:  Very well, Your Honor.

18            Ma'am, you do not have personal knowledge that

19  the individual you were talking to on the phone was

20  Michael Moment; correct?  You keep saying "this man."

21  You do not know for sure that you were speaking with

22  Michael Moment?

23     A.    I believe he admitted that he was the one who

24  called my home.

25     Q.    Ma'am, I'm not asking what Mr. Moment admitted

1    to you.  I'm asking you do you know for sure that you

2    were speaking with Michael Moment?

3         A.    Yes.

4         Q.    Had you ever spoken with Michael Moment before

5    that day, ma'am?

6         A.    No.

7         Q.    So you don't know what his voice sounds like,

8    did you?

9         A.    I heard him in the background on one occasion

10   when I called my daughter.  I heard him rough in the

11   background telling her what to say, and I presumed,  I

12   know the line -- I mean, if it wasn't him, why -- If

13   Nettie Moment is his sister and he is telling me if you

14   call my sister or call my family, --

15        Q.    Ma'am, I'm asking the questions.

16        A.    He is Nettie's brother.  That's what he

17   admitted to me.

18        Q.    Ma'am, last week did you call Mr. Moment's

19   mother?

20             MR. BAKER:  Objection, Your Honor.

21             THE COURT:  Basis?  Restate the question.

22   Called Mr. Moment?

23             MR. HAIRSTON:  Did she call Mr. Moment's

24   mother.

25             THE COURT:  Basis for the objection?

34

1          MR. BAKER:  Last week was the question.

2          MR. HAIRSTON:  Oh.

3          Did you call Mr. Moment's mother, ma'am?

4      A.    Again, I did not know that that was

5  Mr. Moment's mother because Mr. Moment has a whole long

6  list of different addresses all over America and

7  different Moments, and I have been scared, terrified out

8  of my skin of this man that I don't know, who has

9  threatened me, and I called  -- there are several

10  numbers in the people data, and I called this number,

11  and this lady said she was his mother.  Whether that's

12  true or false, I don't know.

13      Q.    Did you call Mr. Moment's mother last week,

14  ma'am?

15      A.    She said she was.

16      Q.    Okay.  So you did call an individual that --

17      A.    I called an individual that said she was.

18          MR. BAKER:  Objection, Your Honor.

19          THE COURT:  Basis?

20          MR. BAKER:  Relevance.

21          MR. HAIRSTON:  May we approach?

22          THE COURT:  Mr. Hairston; yes.  Take a seat in

23  the jury box.

24          (Thereupon, the witness withdrew from the

25  witness stand, counsel for the parties approached the

1    bench and conferred with the Court, in low tones of

2    voice, as follows:)

3          MR. HAIRSTON:  Your Honor, this witness stated

4    that the individual that she believed that she spoke

5    with on the phone was Michael Moment and that the person

6    that threaten her said if you ever call my family again,

7    that I will beat the shit out of you, and she stated

8    that she was terrified of him.  She's now testified that

9    she called Mr. Moment's mother, so therefore she was not

10   terrified.

11         THE COURT:  I will permit it on that basis.  (

12         (Thereupon, the proceedings at the bench were

13   concluded, counsel for the parties returned to their

14   respective places at counsel table, the witness resumed

15   the witness stand and testified further, as follows:)

16         BY MR. HAIRSTON:

17   Q.   Ma'am, last week you spoke with a lady that

18   you believed to be Michael Moment's mother?

19   A.   I don't believe.  She said she was.

20   Q.   Okay.  You spoke with a lady last week that

21   you know to be Michael Moment's mother?

22   A.   She said she was.

23   Q.   Did you call an individual that you thought

24   was Michael Moment's mother?

25   A.   No.  I called several numbers, and that one

1    answered, because he has sheets of telephone numbers.

2         Q.    Okay.  So you called several people with the

3    last name "Moment"?

4         A.    But their phones were disconnected.

5         Q.    Okay.  But you did attempt to call several

6    people whose last name was "Moment"?

7         A.    Yes.

8         Q.    Within the last two weeks?

9         A.    Yes.

10        Q.    Attempting to get in touch with somebody that

11   was related to Michael Moment?

12        A.    That knows him.

13        Q.    That knows him or related to him?

14        A.    It doesn't matter.  I don't know because there

15   are so many Moments, I don't if they are related or, you

16   know, --  There are so many of them with different

17   addresses, I don't know.

18        Q.    Well, ma'am, let's go back to the statement

19   that you made earlier regarding when you were locking

20   for your daughter.

21        A.    Uh-huh.

22        Q.    You looked up the name "Moment" because you

23   were hoping to find somebody with the last name that was

24   related to him; correct?

25        A.    I was hoping -- No.  No.  I looked up

1    "Moment," and this came up, and I thought, great, maybe

2    this  -- because it's an unusual name, even though it's

3    listed on pages and pages and pages at different

4    addresses.  But I called this -- this woman worked at

5    the Coast Guard, so I said, well, I didn't know whether

6    they were related or not, but the name is the same.  So,

7    I called, and they said she works there, and I asked

8    them  -- I told you that already -- and I asked them to

9    have her call me.  So, I felt better when they called me

10   -- when she called me because at least I knew that my

11   grandchild and my daughter were safe because we are her

12   backup.

13       Q.    So, ma'am, now you are saying that your

14   testimony earlier that you called hoping to find a

15   family member of his by the last name of "Moment" is not

16   correct?·

17       A.    We are talking two different things here.

18       Q.    You were hoping to find somebody that knew

19   him?

20       A.    Excuse me, please.  You just asked me a while

21   ago if I knew the woman was Moment.  I didn't know they

22   were related.  When I called --  When I found that

23   article -- and I have it here; I can show you.  When I

24   found that article in the Internet, I was hoping they

25   were related because I didn't know this man, and here my

1  daughter tells me she meets a man that she has questions
2  about, and here she's gone with her child, and I don't
3  know where they are.  And usually she would tell me "I'm
4  going out of town" or "I'm doing something."  I didn't
5  hear from her, and it snowed that weekend.  My husband
6  and I were worried.  So when I --  I had found that, and
7  I had it in my file, I didn't do anything with it, but
8  at this time I thought --  When I called the police, the
9  police -- I said, you know, my daughter and her
10  daughter, and it's unusual; usually, they would tell me
11  if they are going out of town.  Her phone doesn't
12  answer, her cell phone doesn't answer, and I became
13  extremely worried about them.  So I looked for that
14  Nettie Moment because I pulled it out earlier, actually.
15  I never had any use for it.  And I said, "Wonder if
16  these two may be related?"  So I called the Coast Guard
17  -- and I have the name of who I spoke with, so I can
18  call them for witness if you need -- and I said, you
19  know, my daughter and her daughter is missing, and I
20  said it's unusual because usually she tells me if she is
21  going out of town, and she didn't.  So, I said she
22  mentioned that she has somebody  -- met somebody named
23  Moment, and I don't know if this person is related to
24  that person.
25      Q.    Ma'am, --

1    A.    May I finish, please?

2    Q.    Thank you, ma'am.

3    A.    I don't know if this person is related to that

4    person.

5              MR. HAIRSTON:  Move to strike, Your Honor.

6              THE COURT:  Ma'am, what you have to do is

7    answer questions that are asked by defense counsel.

8              THE WITNESS:  Okay.

9              THE COURT:  When you have completed the answer

10   to that question, then he'll ask another question.

11             THE WITNESS:  Okay.

12             THE COURT:  The Government can ask any

13   follow-up questions he wishes.  Mr. Hairston, next

14   question, please.

15             MR. HAIRSTON:  Thank you, Your Honor.

16             So, ma'am, the statement that you made earlier

17   regarding looking up the last name "Moment," hoping to

18   find an individual related, you were hoping to find an

19   individual related to Michael Moment, so that you could

20   possibly get in contact with him or your daughter;

21   correct?

22   A.    Huh-uh.  No.

23   Q.    No.  So,  -- and the Moments that you called

24   last week was an attempt to get in touch with an

25   individual that was related to Mr. Moment or somebody

1      that was related and knew Mr. Moment; correct?

2          A.    Yes.

3                MR. HAIRSTON:  Court's indulgence.  (Pause)

4                Ma'am, you said you called people trying the

5      find somebody that knew Mr. Moment.  Why were you trying

6      to find out information about Mr. Moment?

7          A.    Because he is a faceless --

8                THE COURT:  Excuse Me.  At which point?

9                MR. HAIRSTON:  Last week.

10               THE COURT:  Last week.  Okay.  Very well.

11         A.    The numbers are disconnected, anyway, but --

12     and they are listed as his numbers, anyway, from Florida

13     to Springfield, Illinois, to this place, to that place.

14         Q.    Let's talk about Florida.  You spoke with a

15     lady last week down in Florida?

16         A.    Yes. I got that -- Yes.

17         Q.    And she said she was Michael Moment's mother?

18         A.    Yes.

19         Q.    Did you know of Mr. Moment's siblings?

20         A.    No.

21         Q.    You didn't talk to her about Michael Moment's

22     siblings at all?

23         A.    No.

24         Q.    Okay.  But she said she was Michael Moment's

25     mother?

41

1    A.    Yes.

2    Q.    And so you had a conversation with her?

3    A.    Yes.  I told her that, you know,  -- I asked

4    her if he was violent because that's my fear, has been

5    my fear.

6    Q.    Ma'am, you don't have to tell about the

7    conversations with anybody else.

8    A.    Oh, okay.

9    Q.    How long did that conversation last?

10    A.    Less than five minutes.

11    Q.    And you called all the way down to Florida?

12    A.    Oh, yes.  I feel very unsafe.

13    Q.    But the individual that you spoke to on the

14    phone --

15    A.    Uh-huh.

16    Q.    -- said don't call any of my family members --

17    A.    Uh-huh.

18    Q.    -- or I'll beat you up in a bar or an alley?

19    A.    Yes.

20    Q.    Okay.

21    A.    So is he going to go further with that?  Is

22    that what you are implying, sir?

23         THE COURT:  At this time, ma'am, just let him

24    ask certain questions.  You have to follow the rules.

25    Those are his questions.

1          THE WITNESS:  Okay.  Sorry, Your Honor.  Been

2     a hard time for me, sir.

3          BY MR. HAIRSTON:

4     Q.    Ma'am, you say you are concerned about your

5     granddaughter; correct?

6     A.    Yes.

7     Q.    And you are actually taking your daughter to

8     court to get visitation rights with your granddaughter;

9     correct?

10     A.    Yes, because she is emotionally and physically

11     being abused by her mother and this man sitting there.

12     Q.    Have you seen her being physically abused by

13     Mr. Moment?

14     A.    I saw her with marks in her back, yes, and a

15     burn on her face, yes.

16     Q.    Ma'am, but you don't know how your

17     granddaughter got those marks, do you?

18     A.    Well, she is living with the two of them, so I

19     have to assume --

20     Q.    But you don't know how --

21          MR. BAKER:  Your Honor, I am objecting to this

22     line as being --

23          THE COURT:  If you are objecting, just stand

24     up and say "Objection."

25          MR. BAKER:  Object.

1          THE COURT:  Basis?

2          MR. BAKER:  Irrelevant, Your Honor.

3          THE COURT:  I'll permit a little bit more.

4   Then we will move on.

5          MR. HAIRSTON:  Very well, Your Honor.

6          THE COURT:  Overruled.

7          BY MR. HAIRSTON:

8      Q.   Ma'am, you don't know how your granddaughter

9   got those marks, do you?

10     A.   She cannot talk.  She can't talk.  They

11  prevent her from speaking.  She is so, so under such

12  restraint, she cannot talk.

13     Q.   Ms. Reardon, you do not know how your

14  granddaughter got those marks, do you?

15     A.   She cried and said she got them on her desk,

16  and I pay her school fees, so I know she couldn't have

17  gotten them on her desk, two belt buckle marks.  She

18  couldn't have gotten it on her desk.

19     Q.   So she can talk?

20     A.   They don't allow -- She can't --  They don't

21  allow her to talk.  She can't speak to me on the phone,

22  she can't visit me, she can't do anything, and this man

23  is totally in control of my daughter, totally and

24  completely.

25         MR. HAIRSTON:  Court's indulgence.  (Pause.)

44

1          Ma'am, where does your daughter live?

2     A.    I don't know.  She lived in a house that I

3  owned, and they moved saying they were getting married.

4  I don't know whether they have.  And I don't know where

5  she lives now, have no idea.

6     Q.    Did you evict her out of the house, ma'am?

7     A.    I did not evict her.  We put the house up for

8  sale, and she moved out.  She said she was getting

9  married to that man there, and she was going to --  I

10 said, well, if you are going to get married, because she

11 wasn't paying any rent, I said if you are going to get

12 married, you have to find a home for yourself.  And we

13 had agreed even before he came on the scene that that

14 house was much too big for her.

15    Q.    Okay.

16    A.    It was four bedrooms, three and a half baths.

17    Q.    And Mr. Moment didn't live in that house, did

18 he?

19    A.    Yes, he did.

20    Q.    You know this for a fact?

21    A.    Well, --

22    Q.    Yes or no, ma'am.

23    A.    Do I know this for a fact?  When his sister

24 says they are going home and when she talks on the phone

25 and he is in the background and when he called the

```
 1    police saying I was harassing him, he was there.

 2         Q.    He was where, ma'am?

 3         A.    In that house.

 4         Q.    Where is that house located?

 5         A.    63 Kingman View Circle.

 6         Q.    Kingman View Circle?

 7         A.    Yes.

 8         Q.    Where is that, ma'am?

 9         A.    Silver Spring.

10         Q.    Silver Spring.  Is that in Maryland?

11         A.    Yes.

12         Q.    Did that show up on your caller ID, ma'am?

13         A.    I beg your pardon.

14         Q.    Did that show up on your caller ID?

15         A.    What should show up on my caller ID?  I don't

16    understand.

17         Q.    When you said that he was in that house in

18    Kingman -- in Silver Spring, Maryland, --

19         A.    Yes.

20         Q.    You don't know for a fact that he was in

21    Silver Spring, Maryland, do you?

22         A.    He was talking in the background as my

23    daughter was hysterical and talking to me, and he called

24    the police and the police said he was there.

25         Q.    No, I'm talking about the day of the alleged
```

1   threats, on the 27th.

2       A.    I don't know where he was calling from then

3   because the telephone was blocked.  He has no phones in

4   his name.  It's in everybody else's name.

5       Q.    And you don't know for a fact that Mr. Moment

6   lived at that address; correct?

7       A.    The sister said he was going home with the

8   girlfriend.

9       Q.    Ma'am, answer the question.  Do you know for a

10  -- Do you have personal knowledge that Mr. Moment lived

11  at that address?  Yes or no?

12      A.    I think you would have to address that

13  question to Mr. Moment.  I don't know.

14      Q.    I'm addressing the question to you, ma'am.

15  Yes or no?

16      A.    Do I have personal knowledge?

17      Q.    Yes.

18          THE WITNESS:  I don't want to endanger my

19  granddaughter.

20          THE COURT:  Excuse me, ma'am.  You have to

21  speak loud enough that everyone can see.  Everyone can

22  hear.  I'm sorry.  You cannot speak directly only to me.

23          THE WITNESS:  Can you ask the question again?

24          THE COURT:  His question was:  Do you have

25  personal knowledge?

1          THE WITNESS:  No.

2          BY MR. HAIRSTON:

3          Q.    Ma'am, do you have -- because you haven't

4    answered this question.  Do you have personal knowledge

5    that the individual that you spoke to on the 27th of

6    January was Michael Moment?  Never having spoken with

7    him before and never having seen him before, do you have

8    personal knowledge that the individual that you spoke

9    with on that day was Michael Moment?

10         A.    Yes.

11         Q.    But you never spoke with him before?

12         A.    I heard him in the background when I talked to

13   my daughter.  He is rough, speaks very roughly.

14         Q.    You have never spoken with him before, have

15   you?

16         A.    No.  He wouldn't come to the phone.  I asked

17   her to put him on, and he says he doesn't want to see

18   me, doesn't want to talk to me while he was at my house.

19         MR. HAIRSTON:  No further questions, Your

20   Honor.

21         THE COURT:  Before I permit redirect, I'm

22   going to ask couple of questions.  I will let you,

23   Mr. Hairston, ask any follow-up, and then you,

24   Mr. Baker.

25         Ma'am, there were several questions about you

1   calling people whose last name was "Moment" during the

2   last couple of weeks.  Why did you make those phone

3   calls?

4                THE WITNESS:  I was trying to find out because

5   several things been happening to me, Your Honor.  They

6   have been threatening me in different ways, and I was

7   trying to find out if I could get a handle on what this

8   man is all about, who is he, who is he.

9                THE COURT:  Thank you.  Any further questions

10  based on my question?

11               MR. HAIRSTON:  One, Your Honor.  Excuse me.

12  In trying to find out who is this man, you were trying

13  to get in touch with friends and family members;

14  correct?

15               THE WITNESS:  I don't know who they are

16  because --

17               MR. HAIRSTON:  Okay.  But you called people

18  with the last name of "Moment;" correct?

19               THE WITNESS:  Yes, but his name --

20               MR. HAIRSTON:  Thank you, ma'am.

21               THE WITNESS:  -- is listed in about 30 pages.

22               THE COURT:  Mr. Baker, you may conduct

23  redirect.

24               MR. BAKER:  I have no redirect, Your Honor.

25               THE COURT:  Very well.  Thank you, ma'am.  You

1    may step down.  Don't discuss your testimony with any

2    other persons until this trial is concluded.

3              THE WITNESS:  Sure.

4              THE COURT:  Thank you for testifying.

5              THE WITNESS:  Thank you, Your Honor.

6              (Thereupon, the witness was excused from the

7    witness stand.)

8              MR. BAKER:  Your Honor, Government calls

9    Detective Wilson.

10             THE COURT:  Okay.  One moment.

11             We'll take a brief recess in this trial, so we

12   can handle some other matters with lawyers who are in

13   the courtroom.  We'll take a ten-minute recess in this

14   case.

15             Reporter needs a break at this time?  Yes.

16   Very well.  Ten-minute recess in this case.

17             (Proceedings recessed.  3:30 p.m.)

18             (Proceedings resumed.  4:05 p.m.)

19             THE DEPUTY CLERK:  Recalling United States v.

20   Michael Moment, M4828-04.

21             THE COURT:  Very well.  We've finished the

22   testimony of one witness and ready to call the next

23   witness.  You may do so now.

24             MR. BAKER:  Thank you.

25             MR. HAIRSTON:  Good afternoon again, Your

Honor.  Russell Hairston on behalf of Michael Moment.

THE COURT:  Hold on.  Mr. Moment is present;
Mr. Keefe for the Government.

MR. BAKER:  Actually, Mr. Baker for the
Government.

THE COURT:  Mr. Baker.  Mr. Keefe is standing;
Mr. Baker is calling the next witness, who is coming
forward.  Let's proceed.

MR. BAKER:  Your Honor, the Government calls
Detective Donna Wilson.

THE COURT:  Detective Wilson, if you could
approach the witness stand and raise your right hand?

Thereupon,

**DONNA WILSON,**

having been called as a witness on behalf of the
Government and having been first duly sworn by the
Deputy Clerk, was examined and testified, as follows:

**DIRECT EXAMINATION**

**BY MR. BAKER:**

Q.    Detective Wilson, would you state your name
for the record and spell it, please?

A.    Donna Wilson, W-I-L-S-O-N.

Q.    And where do you work, Detective?

A.    At the Second District, located at 3320 Idaho

1    Avenue, Northwest, in Washington, D. C.

2        Q.    And you are a Metropolitan Police officer?

3        A.    Yes.

4        Q.    At some point in time, did you become aware of

5    a complaint made against Mr. Moment?

6        A.    Yes.

7        Q.    When was that?

8        A.    On January the 27th, a report was made to the

9    Metropolitan Police Department.

10       Q.    And once you were made aware of that

11   complaint, did you undertake some investigation?

12       A.    Yes, I did.

13       Q.    All right.  Would you tell the Court how you

14   went about your investigation, what you did?

15       A.    I contacted the complainant, Mrs. Reardon, to

16   ask her about the report that she made.  She informed

17   me --

18            MR. HAIRSTON:  Your Honor, very briefly:  I'm

19   sorry.  I don't know if counsel intends to call

20   Ms. Reardon back again, but we do have rule on

21   witnesses; correct?

22            THE COURT:  We certainly do.  I did not see

23   Mrs. Reardon present.  No witness should be present in

24   the courtroom.  Thank you, Counsel.  Did not see her.

25   Mr. Baker, if you could make sure all witnesses

1    understand that I've invoked the rule against witnesses.

2              MR. BAKER:  I will, Your Honor.

3              THE COURT:  You may proceed.

4      A.    Okay.  I contacted Mrs. Reardon, and she

5    informed me that she received a telephone call from the

6    defendant, Mr. Moment, and that he made a threat to her.

7      Q.    And did you have the complaint in front of you

8    when you were talking with Mrs. Reardon?

9      A.    Yes, I did.

10     Q.    Did your investigation  --  Did her answers to

11   your question conform to the complaint that had been

12   filed by her?

13     A.    Yes.

14     Q.    What did you do next, if anything?

15     A.    Well, in an effort to continue with the

16   investigation, I contacted Mr. Moment and asked him if

17   he could come in and speak with me.

18     Q.    And did he, in fact, come in and speak with

19   you?

20     A.    Yes, he came in.  I read him his rights, I

21   told him that he wasn't under arrest, that he was

22   identified as the suspect in reference to the complaint;

23   he wasn't under arrest now but at some point in the

24   future he could be, and he waived his rights and he

25   agreed to talk with me.

1      Q.    All right.  Did you explain the complaint to

2    him?

3      A.    Yes, I did.

4      Q.    Tell us the questions that you asked and the

5    answers that  -- the pertinent questions that you asked

6    and the answers that Mr. Moment gave you, if you would?

7      A.    Well, specifically I informed him of the

8    allegation that was made in the initial complaint, the

9    251; that the complainant, Mrs. Reardon, had reported

10   that the defendant had --

11         MR. HAIRSTON:  Objection, Your Honor.

12   Hearsay.

13         THE COURT:  Overruled.  If this is for the

14   purpose of understanding the defendant's answers, you

15   may proceed.

16         THE WITNESS:  Okay.  I informed him of what

17   the information in the 251 was, was that he had phoned

18   the complainant and informed the complainant that he

19   would meet her in some dark alley and beat her up.  And

20   in regards to that, I asked him what could he tell me

21   about that complaint, and he told me that he did call

22   her, he had a conversation with her; that he told her

23   that he would meet her in an alley, but he told me that

24   he did not tell her that he would beat her up.

25         Q.    Did you explain to Mr. Moment  -- did you tell

1    him what date the allegation of this phone call was

2    made?

3        A.    I'm pretty sure I did.

4        Q.    And did he confirm that he indeed made the

5    call on that date?

6        A.    Specifically, I don't remember that, but I do

7    recall that he said he did have the conversation with

8    the complainant.

9        Q.    Did you undertake any further investigation in

10   this regard?

11       A.    I spoke with the complainant's daughter,

12   Felita Phillips, and she informed me that she was --

13            MR. HAIRSTON:  Objection, Your Honor.

14            THE COURT:  Overruled.  This is for the basis

15   of understanding the investigation.  I'm not going to

16   take it for the truth and the fact asserted.

17            MR. HAIRSTON:  Very well.

18            THE COURT:  You may proceed.

19       A.    She informed me that she was present when her

20   mother received a phone call.  While Ms. Phillips,

21   Felita Phillips, didn't know who was on the other end,

22   she said that her mother had repeated for her hearing

23   what the caller on the other end was saying to her.

24       Q.    So, if I understand your testimony, you are

25   now talking about what Felita told you; correct?

1         THE COURT: Mr. Baker, is this going to go to

2   questioning of the defendant that the detective made?

3   In other words, it appears now that you are eliciting

4   this testimony for the truth of the fact asserted. Are

5   you providing it to help me understand the statements

6   made by the defendant?

7         MR. BAKER: Exactly, Your Honor.

8         THE COURT: Well, it was in the disjunctive.

9   One or the other. You were taking the second?

10        MR. BAKER: Yes, the latter, Your Honor.

11        THE COURT: Very well. Then you need to tie

12   it into that.

13        BY MR. BAKER:

14   Q.   You have testified that you spoke to

15   Mrs. Reardon and her daughter, Felita; correct?

16   A.   Correct.

17   Q.   And they related to you the event that

18   occurred on the night of -- on the afternoon of the

19   27th; is that right?

20   A.   Correct. Felita indicated while she didn't

21   know who was on the other end of the phone, she said her

22   mother was clearly rattled by the conversation.

23   Q.   All right. Did you have any other contact

24   with Mr. Moment?

25   A.   I spoke with him, I believe, on one other

1    occasion after his initial visit to the Second District.

2         Q.    Did you ultimately -- Were you the arresting

3    officer of Mr. Moment?

4         A.    No, I was not present when he was arrested.

5                        (Pause)

6              THE COURT:  Counsel, do you need a recess?

7              MR. BAKER:  I don't believe so, Your Honor.

8              THE COURT:  Okay.  If you could step to the

9    jury box?  I'm sorry.  Please approach.

10             (Thereupon, the witness withdrew from the

11   witness stand, counsel for the parties approached the

12   bench and conferred with the Court, in low tones of

13   voice, as follows:)

14             THE COURT:  Mr. Hairston had objected to

15   testimony regarding what Felita told the detective and

16   on hearsay basis.  You said that you would tie that up.

17   You said it would be up to me to understand her

18   questioning of the defendant and responses given.  I

19   fail to see right now how that's going to work.  Are you

20   going to link that up because if not, I'm going to

21   sustain Mr. Hairston's objection and strike the

22   testimony regarding what Felita said.  Were there

23   questions asked of the defendant regarding matters that

24   you talked about Felita?  Otherwise, why are you seeking

25   to elicit that testimony, except to ask me to consider

1    it for the truth of the fact asserted?

2            MR. BAKER:  Your Honor, that line of

3    questioning, I wanted to just clear up what she had said

4    because I thought that her answer was confusing.

5            THE COURT:  Her answer?  As to what?

6            MR. BAKER:  The answer to my question as to

7    what Felita had said.

8            THE COURT:  But how is what Felita said -- I

9    thought you said you would link it up to the questioning

10   of the defendant.

11          MR. BAKER:  I did.  I then left that line of

12   questioning, so I'm abandoning that line of questioning.

13          THE COURT:  So then, you do not object to my

14   striking the testimony?

15          MR. BAKER:  If the testimony is going to be

16   the testimony that Felita --

17          THE COURT:  What Felita said to her.  Unless

18   you can link that up, it's pure hearsay.  I was going to

19   admit it because I understood from what you said that it

20   was going to be linked to questioning when she asked him

21   did you --

22          MR. BAKER:  It's not hearsay.  My response to

23   the hearsay objection is that it's not hearsay.  This is

24   an excited utterance.  She is on the phone repeating.

25   He's making a threat to her, and she is repeating that

1     threat.  It is a repetition of the threat that's being

2     made to her.

3                    MR. HAIRSTON:  Sounds like --

4                    THE COURT:  Felita's statement characterizes

5     the repetition of the threat.  Would be hearsay in any

6     event, even if the first witness' statement was an

7     excited utterance.  I mean if Felita were to testify to

8     that.  But now we're not having Felita testify, we have

9     the police officer testifying Felita told her about

10    that.

11                   MR. BAKER:  I agree, Your Honor.  I agree.

12                   THE COURT:  Very well.  I'll strike the

13    testimony regarding what Felita said.  You may return to

14    the stand.

15                   (Thereupon, the proceedings at the bench were

16    concluded, counsel for the parties returned to their

17    respective places at counsel table, the witness resumed

18    the witness stand and testified further, as follows:)

19                   THE COURT:  Nothing that you did.  We just had

20    to address some legal issues.  Thank you.

21                   MR. BAKER:  Your Honor, I have no further

22    questions.

23                   THE COURT:  Very well.  You may cross-examine.

24                   MR. HAIRSTON:  Thank you, Your Honor.

25

1                          CROSS-EXAMINATION

2                  BY MR. HAIRSTON:

3            Q.    Good afternoon, Detective.

4            A.    Good afternoon.

5            Q.    When you spoke with Ms. Pearson (sic), what

6       day was that?

7            A.    Ms. Reardon?

8            Q.    I'm sorry.  Ms. Reardon.  I'm sorry.

9       Ms. Reardon.

10           A.    It was probably a day or two after the

11      complaint was made.

12           Q.    Did you take notes when you spoke with

13      Ms. Reardon?

14           A.    Yes, I did.  I jotted down some notes on the

15      front of the 251 and probably the 252.

16           Q.    And Ms. Reardon told you that she didn't like

17      Mr. Moment, didn't she?

18           A.    She could have said that.

19                  MR. HAIRSTON:  Court's indulgence.  I've got

20      it here somewhere.

21                              (Pause)

22                  MR. HAIRSTON:  May I approach, Your Honor?

23                  THE COURT:  You may.  Mr. Baker, you may

24      approach as well.

25                  THE COURT:  If you are going to approach the

1    witness to show something, Mr. Baker wishes to be there.

2    Yes, he may be there.

3              MR. HAIRSTON:  I was going to show it to him

4    now.

5              (Document shown to counsel.)

6        Q.    Officer, --

7              I guess I have to get this marked.  Well, you

8    said she may have said --

9              THE COURT:  Have this marked as Defense

10   Exhibit 1 for identification.

11             MR. HAIRSTON:  Yes.

12             (Thereupon, Defense Exhibit No. 1

13               was marked for identification.)

14       Q.    Officer, I show you what's been marked as

15   Defense Exhibit 1.  Do you recognize Defense Exhibit 1?

16       A.    Yes, I do.

17       Q.    And, Detective, what is Defense Exhibit 1?

18   Just that page, ma'am.

19       A.    I believe that's the second part of the 252.

20       Q.    Okay.  And could you read the last paragraph

21   of --

22             THE COURT:  I need a little bit more before

23   I'm going to permit this.

24             MR. HAIRSTON:  Very well.  Is there --

25             THE COURT:  Is this a statement, a statement

1    made by her?

2              MR. HAIRSTON:  Yes.

3              THE COURT:  Go ahead.  Proceed, Mr. Hairston.

4              BY MR. HAIRSTON:

5        Q.    Is there something that would help you recall

6    what Ms. Reardon said to you?

7        A.    Okay.  This is --

8        Q.    Ma'am, is this something that would --

9              THE COURT:  Take the document away.  If you're

10   refreshing recollection, I don't want the document in

11   front of her while the witness is questioned.

12             BY MR. HAIRSTON:

13       Q.    Is there something that would help you recall

14   what Ms. Reardon said to you?

15       A.    I am not the author of that report.

16       Q.    You are not the author of this report?

17       A.    I am not the author of that report.

18             THE COURT:  Next question.

19             MR. HAIRSTON:  Very well.

20             But she may have said to you that she doesn't

21   like him?

22       A.    Sure.  Yeah.

23       Q.    Have you spoken with other officers about this

24   matter?

25       A.    Yes.

1     Q.    What other officer?

2     A.    Likely the officer of that report.

3     Q.    Do you know who the officer of this report is?

4     A.    That's Officer Davis, Steve Davis.

5     Q.    Okay.  And you spoke with Officer Davis about

6  this matter?

7     A.    Correct.

8     Q.    And in speaking with Officer Davis, did you

9  get the impression that Mrs. Reardon didn't like

10  Mr. Moment?

11         MR. BAKER:  Objection, Your Honor.

12         THE COURT:  Sustained.

13     Q.    You said you spoke with Mr. Moment; correct?

14     A.    Correct.

15     Q.    And he answered your questions and he told you

16  that he didn't threaten anyone; correct?

17     A.    Yes.  He said that he did not tell her that he

18  would beat her up.

19     Q.    Did you have Mr. Moment read a Miranda card?

20     A.    Yes, I did.

21     Q.    And did he answer the questions on the Miranda

22  card?

23     A.    Yes.

24     Q.    And he chose to answer questions; correct?

25     A.    Yes.

1      Q.     Did you make any notes on the Miranda card as

2      to what Mr. Moment said.

3      A.     On the Miranda card?

4      Q.     Yes.

5      A.     No, I let him fill the card out, and I put my

6      signature on it, and his initials should appear after

7      his "yes" to the three answers, three or four answers as

8      to whether or not he wanted to speak.

9      Q.     Okay.  And Mrs. Reardon told you she had never

10     seen Mr. Moment before; correct?

11     A.     Correct.

12     Q.     And she told you she had never spoken with

13     Mr. Moment before; correct?

14     A.     That's incorrect.  She believed that she had

15     spoken with him, and I believed that she had spoken with

16     him as well because he confirmed that --

17     Q.     Ma'am, I'm talking about before the 27th of

18     January.

19          MR. BAKER:  Excuse me, Your Honor.  May the

20     witness be allowed to finish her answer?

21          THE COURT:  Yes.  You may finish.

22          THE WITNESS:  Can you repeat the question,

23     please.

24          BY MR. HAIRSTON:

25     Q.     I said Mrs. Reardon hadn't spoken with

1    Mr. Moment before either; correct?

2        A.    That I recall, that's correct.

3        Q.    And you were saying that she believed that she

4    had spoken with him but she didn't know for sure that

5    she had spoken with him; correct?

6        A.    She never doubted that it wasn't him.  She

7    said that it was Michael Moment.  She didn't believe it

8    was anyone else but him.

9        Q.    Well, did you ask her how she knew for sure

10   that it was Michael Moment?

11       A.    She said that he told her that he didn't

12   appreciate her calling his sister, and that was the

13   reason she felt pretty much for his call to her.

14       Q.    But she didn't know for sure that she was

15   speaking  -- other than the individual that she was

16   talking to on the phone saying he didn't appreciate her

17   calling his sister, she didn't know for sure that the

18   individual she was talking to was Michael Moment?

19       A.    She felt it was him.

20       Q.    But based on your investigation, you didn't

21   know for sure that she had spoken with Michael Moment?

22       A.    I didn't doubt her.  I believed her when

23   she --

24       Q.    But did you know for sure that she had spoken

25   with him?

1      A.     I believed that she was certain.

2      Q.     You believed that she was certain that she

3   spoke with him.  But, Officer, it's a yes or no

4   question.  You did not know for sure that Mrs. Reardon

5   knew that she had spoken --

6           THE COURT:  Let me just stop this line of

7   questioning.  There has been no objection.  I'm not

8   going to accept any testimony about a police officer's

9   personal belief in facts that are before the Court for

10  determination.

11          MR. HAIRSTON:  I understand, Your Honor.  I

12  understand.

13          THE COURT:  And I will strike all testimony --

14  It's not at all improper for a witness to answer

15  questions, but I'm not going to permit that testimony.

16  Thank you.

17          BY MR. HAIRSTON:

18     Q.     Did you conduct any additional investigation

19  regarding this matter?  Did you look at the caller ID?

20     A.     She, Ms. Reardon, informed me that no number

21  appeared.

22     Q.     Okay.  Did you check Mr. Moment's home phone

23  to see if he had called?

24     A.     No.

25     Q.     Did you check Mr. Moment's cell phone to see

1    if he had called?

2        A.    No.

3        Q.    Do you know where Mr. Moment lived on the 27th

4    of January?

5        A.    Mr. Moment gave me a post office box.  I asked

6    him for a street address, and all I could get was a post

7    office box.  So, the answer to that is no, I don't know

8    where he lives.

9        Q.    Where is that post office box?

10       A.    I don't recall.

11             MR. HAIRSTON:  No further questions, Your

12   Honor.

13             THE COURT:  Any redirect?

14             MR. BAKER:  Yes.

15

16                   **REDIRECT EXAMINATION**

17             **BY MR. BAKER:**

18       Q.    Detective Wilson, is the person that you

19   interviewed at the station and who admitted that he had

20   made a call to Mrs. Reardon and said he would meet her

21   in the alley, is that person in the courtroom today?

22       A.    Yes, he is.

23       Q.    Could you describe that person by where he is

24   sitting and what he is wearing?

25       A.    Mr. Moment.  He's seated to the right of his

1    counsel with cornrowed hair and a black jacket and a

2    black shirt.

3            MR. BAKER:  Your Honor, may the record reflect

4    the in-court identification?

5            THE COURT:  Any objection, Mr. Hairston?

6            MR. HAIRSTON:  No, Your Honor.

7            THE COURT:  Without objection, it shall so

8    reflect.

9            MR. BAKER:  No further questions, Your Honor.

10           THE COURT:  Thank you, Detective Wilson.  You

11   may step down.  Don't discuss your testimony with any

12   other person until this trial is concluded.

13           THE WITNESS:  Okay.

14           THE COURT:  Thank you.

15           (Thereupon, the witness was excused from the

16   witness stand.)

17           MR. BAKER:  Your Honor, the Government rests.

18           MR. HAIRSTON:  Your Honor, at this time we

19   move for judgment of acquittal.

20           THE COURT:  Do you wish to make argument or

21   are you submitting?

22           MR. HAIRSTON:  Well, Your Honor, there has

23   been testimony --  Well, we'll make argument, first and

24   foremost.  Mrs. Reardon stated that she believed

25   Mr. Moment to be  -- she actually testified that she

68

1   believed Mr. Moment to be in Maryland when he made the

2   phone call, which would put in question the jurisdiction

3   because Mr. Moment was in Maryland.

4          Next, Ms. Reardon stated that she did not know

5   for sure that the individual that she was speaking to

6   was Michael Moment.  She had never met Mr. Moment; she

7   had never spoken with him on the telephone.  She even

8   stated in her testimony that she told the individual on

9   the phone, "Whoever you are, please stop  --" I believe

10  it was "Please stop using that language" or  -- Court's

11  indulgence.  Oh, "I don't go to a bar, whoever you are,"

12  and she also stated that  -- Well, she stated that she

13  was terribly frightened, and she claimed the individual

14  on the phone, who she believed to be Michael Moment,

15  said that he would beat the shit out of her if she

16  continued to call his family members, and she testified

17  behind that that she called an individual whom she

18  believed to be his mother and called other individuals

19  whom she believed to be friends and family members of

20  his, therefore suggesting that she was not frightened by

21  what she believed to be threats from an individual whom

22  she thought to be Michael Moment.  The officer testified

23  that Mr. Moment came in, spoke with her and said that at

24  no time did he threaten anyone, and there has not been

25  anything  -- the Government has not met their burden.

1    There is no testimony that Mr. Moment actually

2    threatened Ms. Reardon.

3              THE COURT:  Anything from the Government?

4              MR. BAKER:  Yes, Your Honor.  Your Honor, the

5    two witnesses that the Government has called, their

6    testimony has to be weighed together.  Mrs. Reardon

7    testifies that, yes, the call was made; that she

8    believed that it was Mr. Moment.  That's not enough.

9    But that she was sure of what the language was in the

10   call; that that was a threat.  A few minutes later she

11   reports the threat to the police.  She again repeats the

12   threat to the police officer.

13             Now, Detective Wilson's testimony is that

14   Mr. Moment, after being advised of his rights, admits he

15   called.  Not only does he admit that he called, he

16   admits that he called and said I'll meet you in the

17   alley.  The only thing he doesn't admit to is the

18   beating the shit out of you.  So, Detective Wilson's

19   testimony of the admissions of the defendant, together

20   with Mrs. Reardon, certainly establishes our case beyond

21   a reasonable doubt.

22             THE COURT:  Thank you.  First of all, I have

23   to apply the evidence in the light most favorable to the

24   Government, and in applying that standard, I am going to

25   deny the motion for judgment of acquittal.  I'll address

1    first the jurisdictional issue which has been addressed

2    by the Court of Appeals that <u>United States v. Baish</u>

3    says whether jurisdiction over threats offense -- B A I

4    S H -- has jurisdiction over the threats offense,

5    whether threat was uttered or heard in the District of

6    Columbia.  That's 460 A. 2nd.  It's at 43.  It's a 1983

7    case, and clearly the evidence establishes a threat was

8    heard and of residents at Harrison Street, Northwest,

9    Washington, D. C.

10           Secondly, without the testimony of the

11   detective about what the defendant said, although there

12   may well be an issue about whether defendant actually

13   made the threat, but here where the defendant

14   acknowledged making a telephone call to the person, to

15   the complaining witness and admitted substantially the

16   significant elements of the conversation, he has removed

17   any doubt about whether he made the phone call, and the

18   only issue remaining to determine is precisely what was

19   said and whether that constituted a threat.  Certainly,

20   if one credits the complaining witness, the words that

21   were uttered were of such a nature as to convey a reason

22   to fear serious bodily harm or injury and that the

23   defendant intended to utter the words as a threat, and

24   therefore I deny the motion.

25           Counsel, do you wish to call a witness?  It's

71

1    4:30.  We can call another witness.

2            MR. HAIRSTON:  Very well.  Defense calls

3    Ms. Moment, Nettie Moment.

4            THE COURT:  Ma'am, please take the witness

5    stand.  Please raise your right hand and be sworn.

6            Thereupon,

7                       **NETTIE MOMENT,**

8    having been called as a witness on behalf of the

9    Defendant and having been first duly sworn by the Deputy

10   Clerk, was examined and testified, as follows:

11           THE WITNESS:  I will tell the truth.

12           THE DEPUTY CLERK:  You may be seated.

13

14                   **DIRECT EXAMINATION**

15           **BY MR. HAIRSTON:**

16       Q.    Ma'am, could you state your name and spell it

17   for the record, please?

18       A.    Nettie Moment.  N-E-T-T-I-E M-O-M-E-N-T.

19       Q.    And, ma'am, how do you know the defendant,

20   Michael Moment, here?

21       A.    He is my brother.

22       Q.    Older brother or younger brother?

23       A.    Younger brother.

24       Q.    Younger brother.  Sorry about that.

25       A.    Oh, that's all right.

72

1       Q.    Where do you work, ma'am?

2       A.    I would, for Department of Homeland Security,

3  United States Coast Guard headquarters.

4       Q.    And let me direct your attention back to

5  January of this year.  Did you receive a phone call from

6  work?

7       A.    Yes.

8       Q.    From your job?

9       A.    Yes, my supervisor.

10      Q.    And based on that phone call from your

11  supervisor, what did you do?

12      A.    Do you want to know what my supervisor said

13  or --

14      Q.    Ma'am, you can't tell me what your supervisor

15  said.  That would be hearsay.

16      A.    Okay.  Well, I contacted Ms. Reardon, I think

17  her name is.

18      Q.    And who do you know Ms. Reardon to be?

19      A.    My supervisor explained that she was Felita's

20  mother.  That's how I first found out who she was.

21      Q.    Okay.  And so you called Ms. Reardon; correct?

22      A.    Right.

23      Q.    And how long was that conversation that you

24  had with Ms. Reardon?

25      A.    It was probably about five to seven minutes.

1      Q.    Okay.  And based on your conversation with

2    Ms. Reardon, what did you perceive  -- what were you

3    thinking after that phone call with Ms. Reardon?

4      A.    That my brother had kidnapped her daughter and

5    her granddaughter, and she didn't know where they were,

6    and she, in a threatening way, told me that she was

7    contacting the policeman.

8              MR. BAKER:  Objection.  Move to strike.

9              THE COURT:  Well, basis for the objection?

10             MR. BAKER:  About to give hearsay testimony.

11             THE COURT:  Well, if that's your objection,

12    then some hearsay has already been given.  You are

13    saying  -- your objection is hearsay is about to be

14    elicited and move to strike or are you moving to strike

15    something that's already been said?

16             MR. BAKER:  I'm moving to strike something

17    that's already been said, Your Honor.

18             THE COURT:  What you were about to strike

19    hadn't come out yet.  Very well.  Let me hear from you,

20    Mr. Hairston.

21             MR. HAIRSTON:  Your Honor, she  -- I guess I

22    want to know what part he wants us to --  At what

23    point --

24             THE COURT:  I'm going to sustain objection to

25    anything  -- Well, counsel,  -- Would you just go to the

1    jury box?  Take an seat over there very briefly.

2              (Thereupon, the witness withdrew from the

3    witness stand, counsel for the parties approached the

4    bench and conferred with the Court, in low tones of

5    voice, as follows:)

6              THE COURT:  First of all, Mr. Baker, you

7    confuse me with about to give.  What are you attempting

8    to elicit?  Because if not for the truth of the fact

9    asserted, what is --

10             MR. HAIRSTON:  Well, no, she didn't say what

11   Ms. Reardon said to her.  She said based on the

12   conversation with Ms. Reardon, she was under the

13   impression that Mr. Reardon had kidnapped -- I'm sorry,

14   Mr. Moment had kidnapped Mr. Reardon's daughter.  That's

15   what --

16             THE COURT:  Right.  But based on that, --

17             MR. HAIRSTON:  Well, I wanted her to stop at

18   that point.  That wasn't hearsay, Your Honor.  It was

19   all that she said afterwards that was --

20             THE COURT:  After that that she started saying

21   more.

22             MR. HAIRSTON:  Exactly.  And that's --

23             THE COURT:  So, I'll explain to her.  Okay.

24             MR. HAIRSTON:  Very well, Your Honor.

25             THE COURT:  Okay, ma'am, you may return to the

1  stand.

2       (Thereupon, the proceedings at the bench were

3  concluded, counsel for the parties returned to their

4  respective places at counsel table, the witness resumed

5  the witness stand and testified further, as follows:)

6       THE COURT:  As you are returning, I just want

7  to tell you there is a rule that prevents you, unless

8  there are certain circumstances from telling exactly

9  what somebody said to you.

10       THE WITNESS:  Okay.

11       THE COURT:  So you can't tell us what happened

12  in this case, but Mr. Hairston -- If you'd listen

13  carefully and just answer the questions that he's

14  asking, unless they are objected to.  If they are

15  objected to, then don't say anything until I rule on the

16  objection.  I think we'll be fine.  So, Mr. Hairston,

17  you may proceed.

18       MR. HAIRSTON:  Well, Your Honor, unfortunately

19  -- Well, anyway, did Ms. Reardon tell you that

20  Mr. Moment had kidnapped her daughter?

21       A.    Yes.

22            MR. BAKER:  Objection.

23            THE COURT:  Let me hear the objection.

24            MR. BAKER:  Objection.  Calls for hearsay.

25            THE COURT:  Sustained.

1           MR. HAIRSTON:  May we approach on that, Your

2  Honor?  It's impeaching Mrs. Reardon's statement --

3           THE COURT:  Yes, but it's impeaching with

4  hearsay.  You may not.

5           MR. HAIRSTON:  May we approach, Your Honor?

6           THE COURT:  You may approach briefly, but

7  counsel when you approach -- unless there's something

8  happening in ten seconds, let's just address it.

9           (Thereupon, the witness withdrew from the

10  witness stand, counsel for the parties approached the

11  bench and conferred with the Court, in low tones of

12  voice, as follows:)

13           MR. HAIRSTON:  Your Honor, Mrs. Reardon said

14  that she never told anybody that Mr. Moment had

15  kidnapped her daughter, and she in fact told this lady

16  that Mr. Moment had kidnapped her daughter.

17           THE COURT:  That is still hearsay.

18           MR. HAIRSTON:  Very well.

19           THE COURT:  I mean that's the problem.

20           MR. HAIRSTON:  I understand.

21           THE COURT:  You can't impeach with that.  Very

22  well.  Thank you.

23           MR. HAIRSTON:  Well, it's not offered for the

24  proof of the matter, it's offered for the fact that

25  Mrs. Reardon is being impeached.  I'm not saying that he

1  did do it.  I'm not offering it for the truth of the

2  matter, I'm offering for the fact that --

3          THE COURT:  Very well.  Let's go briefly

4  through that area and move on.  You can proceed.  Ma'am,

5  you can come back.

6          (Thereupon, the proceedings at the bench were

7  concluded, counsel for the parties returned to their

8  respective places at counsel table, the witness resumed

9  the witness stand and testified further, as follows:

10          MR. HAIRSTON:  That would be the only

11  question.

12          THE COURT:  Okay.  So we've had that response.

13  I will not strike that response.

14          MR. HAIRSTON:  Strike the response, Your

15  Honor?

16          THE COURT:  I will not strike the response.

17          MR. HAIRSTON:  Okay.  Thank you.

18          That weekend of January, I think it was the

19  27th, did you baby-sit  -- what's the young lady's name?

20  Alexandria Patterson, Mrs. Felita Phillips' daughter?

21      A.    I'm not sure of the date, but I did baby-sit

22  on that Saturday, yes.

23      Q.    On that Saturday?

24      A.    Right.

25      Q.    And did you tell Mrs. Reardon that you watched

1    Alexandria and Michael and Felita had gone home?

2        A.    Yes.

3        Q.    Okay.  And you called Mrs. Reardon; correct?

4        A.    Yes.

5        Q.    You were baby-sitting Alexandria that weekend;

6    right?

7        A.    Yes.

8        Q.    And you knew where Mr. Moment and Ms. Phillips

9    had gone for that weekend?

10       A.    Yes.

11       Q.    And how did you know where they had gone for

12   that weekend?

13       A.    While I was taking care of Alexandria?

14       Q.    Yes.

15       A.    They usually stay at a hotel near our home in

16   Owings Mills.

17       Q.    Okay.  Did Mr. Moment tell you where?

18       A.    Yes.  Yes.

19       Q.    So you knew that Mr. Moment had not

20   kidnapped --

21       A.    Yes.

22             THE COURT:  Move on to another area.

23             MR. HAIRSTON:  Very well.  Court's indulgence.

24                      (Pause.)

25             No further questions, Your Honor.

THE COURT:  Okay.  Counsel, you may
cross-examine.  We're going to go about ten more minutes
today.

MR. BAKER:  No questions, Your Honor.

THE COURT:  No questions?  Very well.  Thank
you.

Ma'am, don't discuss your testimony with any
other person until this trial is concluded.

THE WITNESS:  Okay.

(Thereupon, the witness was excused from the
witness stand.)

THE COURT:  Okay.  Given we now have nine more
minutes remaining, unless you have a very brief witness,
I suggest that we recess today.  Do you want to try with
another witness?

MR. HAIRSTON:  I can't say it's going to be --
It's going to be the daughter, Your Honor, Ms. Phillips.
I'm sorry.  Ms. Reardon's daughter - Ms. Phillips.

THE COURT:  I think that would be best.  And
let me hear from the Government whether you wish to
begin with eight or nine minutes of testimony or just
continue till tomorrow.

MR. BAKER:  My inclination is to get as much
testimony as we can, but I have no real objection.

THE COURT:  Very well, we can begin with that

1   testimony.  Let's get another few minutes of testimony.

2              THE DEPUTY CLERK:  Please raise your right

3   hand to be sworn.

4              Thereupon,

5                       FELITA PHILLIPS,

6   having been called as a witness on behalf of the

7   Defendant and having been first duly sworn by the Deputy

8   Clerk, was examined and testified, as follows:

9

10                     DIRECT EXAMINATION

11             BY MR. HAIRSTON:

12        Q.   Ma'am, could you state your name for the

13   record and spell it?

14        A.    Felita Phillips, F-E-L-I-T-A; Phillips,

15   P-H-I-L-L I P S.

16        Q.    And, ma'am, do you know Mr. Moment?

17        A.    Yes.

18        Q.    How do you know Mr. Moment?

19        A.    He is my fiance'.

20        Q.    How long have you all been engaged?

21        A.    Over a year.  No, in August -- almost a year.

22        Q.    Almost a year?

23        A.    Almost a year.

24        Q.    Do you have a wedding date?

25        A.    We have a attentive wedding date, yes.

1     Q.    Want to tell us when it is?

2     A.    Well, when we gotten engaged, we said that it

3   would be November 23rd, 2005, I think, something like

4   that, but it could change.

5     Q.    Very well.  And, ma'am, you know Pearl

6   Reardon?

7     A.    Yes.

8     Q.    How do you know Pearl Reardon?

9     A.    She is my mother.

10    Q.    Now, do you have a good relationship with your

11  mother?

12    A.    Currently?

13    Q.    Currently.

14    A.    It is not very good.

15    Q.    Would you classify it as strained?

16    A.    Very much so.

17    Q.    And why is that, ma'am?

18    A.    Because of my engagement to Michael.

19    Q.    You have to speak up, ma'am.  I can't hear

20  you.

21    A.    Because of my engagement to Michael,

22  Mr. Moment.

23    Q.    And what do you mean?

24    A.    She doesn't approve of him.

25    Q.    She told you that?

1     A.     Yes.

2     Q.     She doesn't like him?

3     A.     Yes.

4     Q.     She doesn't --

5     A.     Doesn't think that he's good for me.

6     Q.     But she told you she doesn't like him?

7     A.     Yes.

8     Q.     Now, you've been seeing Mr. Moment for what,

9  since August of last year, and you all have occasion to

10  go out of town or go away for the weekend?

11    A.     Yes.

12    Q.     And every time you all go away for the

13  weekend, would you always tell your mother?

14    A.     No.

15    Q.     Would you tell somebody?

16    A.     Yes.

17    Q.     So it's not like you just up and go out of

18  town with Mr. Moment and no one knew where you were?

19    A.     Right.

20    Q.     And would you take your daughter, Alexandria,

21  with you when you go out of town with Mr. Moment?

22    A.     She's gone with us on occasions.

23    Q.     Well, let's move up to around January of  --

24  well, before.  You said you didn't always tell your

25  mother when you went out of town?

1    A.    No.

2    Q.    And let's move up to January of 2004.  Did you

3    happen to go out of town with Mr. Moment the weekend of

4    the 26th?

5    A.    Yes.

6    Q.    And how long were you gone for that weekend?

7    A.    I picked my daughter up from ballet in the

8    afternoon on Saturday, and we were  -- we went Saturday,

9    came back Sunday, late in the afternoon.

10    Q.    You went Saturday and came back Sunday?

11    A.    Yes.

12    Q.    You weren't gone Monday and Tuesday?

13    A.    No.

14    Q.    Did you call your mother that weekend and let

15    her know where you were?

16    A.    No, I didn't.  I spoke with her when I picked

17    up  -- I told her I picked up my daughter.  I told her I

18    picked up my daughter that Saturday, and that was the

19    end of conversation.

20    Q.    Okay.  So you did speak with her that

21    Saturday?

22    A.    Yes.

23    Q.    You didn't speak with her that Sunday?

24    A.    No.

25    Q.    Was there a time when your mother had received

1    a phone call from an individual and you were sitting at

2    the table, I guess it was, with your daughter?

3        A.    Yes.

4        Q.    And you didn't know whether --  Did you know

5    who was on the phone at the time?

6        A.    I didn't know who was on the phone.

7        Q.    Okay.  And when your mother was having this

8    phone call, did she hold the phone out so you could hear

9    who was talking, so that you could hear who was talking?

10       A.    No.

11       Q.    What did your mother do during the process of

12   this phone call?

13       A.    During the process of the call, when she

14   received the call, she sort of like --

15       Q.    Gestured?

16       A.    -- gestured that it was --

17       Q.    Okay.

18            For the record, Your Honor, the witness is

19   pointing to her hand, as if to have the phone in her

20   hand, gesturing towards the receiver of the phone.

21            THE COURT:  Any objection, Counsel?

22            MR. BAKER:  I'm sorry.

23            THE COURT:  Any objection from Government to

24   that characterization?

25            MR. BAKER:  No, Your Honor.

```
 1              THE COURT:  Very well.

 2              BY MR. HAIRSTON:

 3         Q.   Could you hear who was on the other end of the

 4    phone?

 5         A.   No.

 6         Q.   Did you know who was on the other end of the

 7    phone?

 8         A.   No.

 9         Q.   And was your mother arguing with the

10    individual on the phone?

11         A.   Yes.

12         Q.   So she was arguing back?

13         A.   Yes.

14         Q.   Was your mother upset at the time that she was

15    on the phone?

16         A.   It was an argument on the phone, upset  --

17    It was an argument on the phone.

18         Q.   So she was arguing on the phone?

19         A.   Yes.

20         Q.   And --

21              THE COURT:  You've got about one more minute

22    today, Counsel.  I promised the reporter that she could

23    leave at 10 to 5:00, which is reasonable.  She's already

24    stayed as long as she can.

25              MR. HAIRSTON:  Your Honor, we can stop here.
```

1          THE COURT:  Why don't we stop right here and

2    resume in the morning?

3          We took as much of the testimony as we could,

4    ma'am.  Do not discuss your testimony with any other

5    person, any person until this trial has concluded, and

6    overnight you cannot discuss your testimony.. Do you

7    understand that?

8          THE WITNESS:  Yes.

9          MR. HAIRSTON:  What time tomorrow, Your Honor?

10         THE COURT:  Very well.  We will resume -- and

11   let's have you leave the courtroom.  Okay, we'll resume

12   at 10:45 tomorrow morning.

13         MR. HAIRSTON:  Very well, Your Honor.

14         THE COURT:  Sir, let me warn you, Mr. Moment,

15   as I warn all defendants.  Because trial in this case

16   has begun, it will continue in your absence should you

17   not reappear tomorrow.  So I expect to see you here, but

18   whether or not you're here, we're going to go on.

19   What's your answer?

20         THE DEFENDANT:  Yes, sir.

21         THE DEPUTY CLERK:  Sir, sign notice to return

22   to court at 10:30 a.m. on Thursday, August 12th for

23   trial.  Failure to appear on that day, you subject

24   yourself to a fine of $1,000, 180 days, or both, simply

25   for failing to appear.  Do you understand?

1           THE DEFENDANT:  Yes, ma'am.

2           MR. HAIRSTON:  Your Honor, may I be excused?

3           THE COURT:  You may be excused.  Thank you,

4   Mr. Hairston.

5           MR. HAIRSTON:  Have a good evening, Your

6   Honor.

7           THE COURT:  You too.

8           (Proceedings adjourned.  4:51 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATION OF REPORTER**

4

5              I, MARIA M. ALLISON, an Official Court

6      Reporter for the Superior Court of the District of

7      Columbia, do hereby certify that I reported, by machine

8      shorthand, in my official capacity, the proceedings had

9      and testimony adduced upon the trial in the case of the

10     UNITED STATES vs. MICHAEL MOMENT, Criminal Action No.

11     M4828-04, in said court on the 11th day of August, 2004.

12             I further certify that the foregoing 88 pages

13     constitute the official transcript of said proceedings,

14     as taken from my machine shorthand notes, together with

15     the back-up tape of said proceedings.

16             In witness whereof, I have hereto subscribed

17     my name, this, the 16th day of September, 2004.

18

19

20

21

22                         MARIA M. ALLISON, R.P.R.
                           Official Court Reporter

23

24

25